Syllabus.

# Richmond.

LIFE INSURANCE COMPANY OF VIRGINIA v. HAIRSTON.

November 19, 1908.

1. EVIDENCE—*Opinions Upon the Point in Issue.*—A witness should not be asked a question, the answer to which involves an application of the law to the facts and calls for his opinion upon the point at issue between the plaintiff and the defendant.

2. APPEAL AND ERROR—*Rejected Evidence Subsequently Admitted.*—Exceptions taken to rulings rejecting evidence will not be considered where it appears that the questions were afterwards asked the witness and he was permitted to answer them without objection.

3. LIFE INSURANCE—*Prepayment of Premiums—Waiver.*—The provision of an insurance policy that the contract of insurance shall not be deemed complete until the payment of the first premium in cash and in full, is waived, and the policy takes effect from its delivery where, with the full knowledge and approval of the company, and in accordance with its practice in other cases, an agent of the company accepts part of the premium in cash and a note at ten days for the residue, and delivers the policy to the assured; and this is true although the ‧ note is not paid till several days after its maturity.

4. LIFE INSURANCE—*Delivery of Policy—Subsequent Declarations Against Interest—Evidence.*—In an action on a life insurance policy, payable to the wife of the assured, statements of the assured made to his family physician after the policy had been delivered and had ‧ become effective are not admissible in evidence unless they were made to the knowledge of the declarant against his obvious and real interest of a pecuniary or proprietary nature.

5. LIFE INSURANCE—*Delivery of Policy—Subsequent Health of Assured—Evidence.*—Evidence as to the condition of health of an assured after the contract of insurance is completed, and the policy delivered, is immaterial and inadmissible.

6. EVIDENCE—*Expressions of Physical Condition—Res Gestae.*—Where the question at issue is whether a man who died at night committed suicide or died from natural causes, a letter written by him to his

wife on business in the forenoon of that day, and containing expressions as to his physical feelings, is not admissible in evidence as a part of the *res gestae.*

7. INSTRUCTIONS—*General Statement of Law—Hypothetical Case—How Stated.*—If a trial court desires, by instructions, to present a hypothetical case to the jury, it should put before the jury all the facts bearing upon the issue which the evidence proves or tends to prove. The tendency of putting before the jury a part of the facts in one instruction and another part in another instruction, is to distract and mislead them. Generally, the court should content itself with giving the jury general principles of law and leaving them to apply the law to the facts, or else it should put before the jury all of the facts as above indicated.

8. LIFE INSURANCE—*Suicide—Degree of Proof.*—Where an insurance company seeks to avoid the payment of a policy on the ground that the assured committed suicide, the jury should be instructed, if so requested, that the evidence, to warrant a verdict for the defendant on the ground that the assured came to his death by suicide, should exclude every *reasonable* hypothesis of accidental death.

9. FRAUD—*Burden of Proof—Degree of Proof.*—The law never presumes fraud, and if an insurance company seeks to avoid liability on a policy on the ground that the assured has been guilty of material misrepresentation and fraud, the burden is on the company to prove distinctly and clearly the misrepresentations and fraud alleged.

10. LIFE INSURANCE—*Defense of Suicide—Degree of Proof Required.*—The defense of suicide to an action on an insurance policy need not be proved by the degree of proof required to convict one of crime, but should be established by clear and satisfactory proof such as is required to establish fraud. As applied to the proof of fraud, or of suicide, as a defense to an action on an insurance policy, the preponderance of evidence should be such as to overcome the presumption of innocence of moral turpitude or crime; and if, upon a consideration of all the evidence relating to any fact, the jury should be of the opinion that the greater probability from all the evidence is in favor of that particular fact, then they must so find, and the result of the facts thus ascertained must be such as to overcome the presumption of innocence of moral turpitude or crime.

11. LIFE INSURANCE—*Application—Answers Material and Untrue.*—If answers to questions in an application for an insurance policy, which are made parts of the policy, are material and untrue there can be no recovery on the policy.

12. INSTRUCTIONS—*Insufficient Evidence to Support.*—An instruction is properly refused when there is no sufficient evidence before the jury to warrant an instruction on the point covered by it.

13. Instructions—*Directing Verdict on Hypothetical Case—Omission of Material Evidence.*—An instruction concluding with a direction to find for the defendant is properly refused if it leaves out all the evidence with respect to a material part of the plaintiff's case.

Error to a judgment of the Circuit Court of the city of Roanoke in an action of *assumpsit.* Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

(Instructions given on motion of the plaintiffs.)

"(1.) The court instructs the jury, that although you may believe from the evidence that the deceased was found the evening of his death, having convulsions, and that he continued to have them until he died, and that strychnine was found in his stomach, this alone is not sufficient to prove suicide. The defendant company must go further and show that the deceased intentionally and willfully for the purpose of committing suicide, took strychnine, and this must be shown by such evidence as will exclude every reasonable supposition of accidental death, and unless this is so shown from all the evidence you must find for the plaintiff on the issue of suicide.

"(2.) The court further instructs the jury, that if the defendant company seeks to avoid the payment of the policy on the ground that the accused came to his death by suicide, the defendant company must show that every hypothesis of accidental death is excluded by the evidence. Accidental death is presumed by the law, and this presumption cannot be overcome except by proof of facts which exclude every hypothesis of death except by suicide.

"(3.) The court instructs the jury, that no answer to any interrogatories made by an applicant for a policy of life insurance, shall bar the right to recover upon any policy issued upon such application, by reasons of any warranty in said application of policy contained, unless it be clearly proved that such answers are wilfully false, or fraudulently made, or that it was material.

"(4.) The court instructs the jury, that if they believe from the evidence that the defendant company delivered the policy sued on to A. H. Ayers, agent, who delivered it to the deceased, D. P. Willis, and further believe that at no time after the policy was so delivered and before the death of D. P. Willis, did the defendant company give said Willis notice that it wished to cancel the policy, this was a waiver of the condition of prepayment to deliver a policy without requiring the prepayment of the premium.

"(5.) The court instructs the jury, that if the defendant company seeks to avoid the payment of said policy on the grounds that the deceased has been guilty of material misrepresentations and fraud, the burden of proving the misrepresentations and fraud is on the defendant company; that he who alleges fraud must clearly and distinctly prove it. It is not to be assumed on doubtful evidences or circumstances of mere suspicion. The law never presumes fraud, but the presumption is always in favor of innocence and honesty."

To the giving of which and of each of which the defendant, by counsel, objected, which objection was overruled by the court, and the said instructions and each of them given to the jury, to which action of the court the defendant, by counsel, excepted.

And thereupon the defendant, by counsel, moved the court to instruct the jury as follows:

(Instructions first asked for by the defendant.)

"1. (Refused.) The court instructs the jury, that all the defendant company is required in this action to do is to prove by a preponderance of the evidence the facts necessary to be shown to entitle it to a verdict according to the other instructions given to the jury. By the term 'preponderance of the evidence' as applied to the proof of any particular fact in this case, is meant that the greater probability from the evidence is in favor of the existence of such fact. That is to say, if the

jury believe, considering all the evidence in the case relating to any given fact, that the greater probability from all the evidence before them, is in favor of the existence of that particular fact, then they must so find. For example, if the defendant relies upon the fact that the deceased died from strychnine poisoning and not from other causes, and, if the jury believe from all the evidence on that subject that that contention to-wit: that the deceased died from strychnine poisoning is more probably true than the contrary contention, then it is their duty to determine, in making up their verdict, that said fact has been shown.

"2. (Refused.) The court instructs the jury, that in determining whether the deceased, Willis, died from suicide or from natural or accidental causes they shall consider: first, what facts are established by a preponderance of all the evidence on that subject, and, having ascertained what facts are thus established, they shall further consider whether there is any reasonable hypothesis based upon those facts and those facts alone, which are consistent with death from natural or accidental causes; and, if the jury believe that those facts, considered as a whole, and taken together, are inconsistent with death from natural or accidental causes, then they must find for the defendant company.

"3. (Refused) The court instructs the jury, that if they believe from the evidence that the statements testified to by witnesses Wright and Hale in reference to the use by the deceased in respect to indulgence in wine, ardent spirits or malt liquors, were substantially true, and, that the same were not substantially embodied in the answers to questions 11 and 12 of the application aforesaid; and, if they further believe from the evidence that if said statements had been substantially set out in said application the application would have been denied and the policy in question would not have been issued, then the jury are instructed that they must find for the defendant company.

"4. (Refused.) The court instructs the jury, that if they believe from a preponderance of the evidence as above defined the deceased, Willis, on the 23rd day of March, 1906, died not from natural or accidental causes but by his own hand or act, whether sane or insane, they must find for the defendant company.

"5. (Refused.) The court further instructs the jury, that if they believe from the evidence that at the time when the balance due on the first premium under said policy was paid, and witness Ayers delivered the premium receipt therefor, the said Willis was not then in sound health, they must find for the defendant company.

"6. (Refused.) The court instructs the jury, that if they believe from the evidence that the answers to questions 11 and 12, or either of them, in the report of the medical examiner, were not substantially true, and that said questions and the answers thereto, are clearly shown to have been material, then they must find for the defendant company."

But the court refused to give said instructions, or either of them, and gave in lieu thereof the following five instructions:

(Instructions given by the court.)

"(1.) The court instructs the jury, that all the defendant company is required in this action to do except the proof of suicide, is to prove by a preponderance of the evidence the facts necessary to be shown to entitle it to a verdict according to the other instructions given to the jury. By the term, 'preponderance of the evidence,' as applied to the proof of any particular fact in this case, is meant that the greater probability from the evidence is in favor of the existence of such fact. That is to say, if the jury believe, considering all the evidence in the case relating to any given fact, that the greater probability from all the evidence before them, is in favor of the existence of that particular fact, then they must so find. For example, if the

defendant relies upon the fact that the answers to certain questions in the application introduced in evidence, are not true; and, if the jury believe from all the evidence on that subject that that contention is more probably true than the contrary contention, then it is their duty to determine, in making up their verdict, that said fact has been shown.

"(2.) The court instructs the jury, that in determining whether the deceased, Willis, died from suicide or from natural causes, they shall consider, first, what facts are established to the exclusion of every other hypothesis, and having ascertained what facts are thus established, they shall further consider whether there is any reasonable hypothesis based upon those facts and those facts alone, which are consistent with death from natural or accidental causes; and, if the jury believe that those facts, considered as a whole, and taken together, are inconsistent with death from natural or accidental causes; then they must find for the defendant company.

"(3.) The court instructs the jury, that if they believe from the evidence that the statements testified to by witnesses Wright and Hale, in reference to the use by the deceased of wine, ardent spirits or malt liquors, substantially were true, and, that the same were not substantially embodied in the answers to questions 11 and 12 of the application aforesaid, and if they further believe from the evidence that if said statements had been substantially set out in said application, the same would have been denied and the policy in question would not have been issued, then the jury are instructed that they must find for the defendant company; and it is for the jury alone to determine from the whole evidence whether such statements 11 and 12 were false.

"(4.) The court instructs the jury, that if they believe from the evidence to the exclusion of every other hypothesis, that the deceased, Willis, on the 23rd day of March, 1906, died by his own hand or act, whether sane or insane, they must find for the defendant company.

"(5.) The court instructs the jury, that if they believe from a preponderance of the evidence as hereinbefore defined that the answers to questions 11 and 12, or either of them, in the report of the medical examiner, were clearly not true, and that said questions and the answers thereto are clearly shown to have been material, then they must find for the defendant company."

To which action of the court in refusing to give the instructions as asked for by the defendant, and to the giving in lieu thereof of the five instructions last above mentioned, the defendant, by counsel, excepted.

And thereupon, after the said instructions had been given to the jury by the court, and after the refusal of the court to give the instructions as asked for by defendant, the defendant asked the court to further instruct the jury as follows:

(Second set of instructions asked for by defendant.)

Of these A, D, and E, were refused, and B, C, and F, were given.

"(A.) The court further instructs the jury, that while the facts set out in plaintiff's instruction No. ——, are alone not sufficient to prove suicide as set out in said instruction, but those facts, accompanied by such other facts as these, namely: the leaving by the person referred to, of the house of an acquaintance where he had been conversing for an hour and a half or two hours, without any symptoms of being affected by poison, saying he was going to his daughter's house; his being seen within half an hour to stagger and fall; his subsequent death within three and one-half hours, preceded by undoubted symptoms of strychnine poisoning; his exclamations of pain or suffering in the first manifestations of those symptoms; the failure of the person so attacked to ask for relief when approached shortly afterwards, or to give any explanation of his condition, he being then rational; the refusal by

such person of assistance or medical aid, when rational, during the manifestations of said symptoms, and the . statements by him, when first found and rational, that he wanted to be let alone, saying, 'I came here to die; I want to die, and I am going to die right here;' that he did not want to be carried to anybody's house, and denying that anything was the matter with him; are sufficient to justify a verdict in this case for the defendant company.

"(B.) The court further instructs the jury, that while it is true that where a defendant company seeks to avoid the payment of a policy on the grounds that the deceased has been guilty of material misrepresentations and fraud, the burden in proving the misrepresentations is on the defendant company; that where fraud is relied upon, it must be proved clearly and distinctly and not assumed on doubtful evidence, and, the law never presumes fraud as set out in plaintiff's instructions Nos. 3 and 5, yet it is not incumbent upon the defendant company in this action to prove more than that the misrepresentations relied on were false and material; and, if it be true that the answers to the questions in the report of the medical examiner were merely false and also material, then the proof of such facts in the manner set out in these instructions, will entitle the defendant to a verdict in its favor.

"(C.) The court further instructs the jury, that if they believe from the preponderance of all the evidence in the case that the deceased, Willis, was not in sound health at the time of the delivery of the policy sued on in this case, they must find for the defendant.

"(D.) The court further instructs the jury, that if it is clearly shown by a preponderance of all the evidence in this case that the deceased was addicted to the use of opium at any time prior to the date of his examination by the medical examiner of the company, Dr. Simmons, and that his answers to the questions in the report of said medical examiner were material, then they must find for the defendant.

"(E.) The court instructs the jury, that under the contract of insurance sued on in this case, each premium, unless paid at the home office, can only be paid in exchange for the defendant company's receipt signed by the president or secretary, and countersigned by the local agent designated therein; and, that under its terms the policy sued on does not take effect until the first premium is paid, and not then if the insured is not in sound health on the date of such payment. Therefore, if the jury shall believe from the evidence that the said first premium was not paid by an exchange for the receipt of the company signed by the president or secretary of the company, etc., until the 16th day of March, 1906, and if they further believe from the evidence that the insured was not in sound health on said date, then they must find for the defendant, unless the company, had by its president, a vice-president or secretary, changed said contract in respect to requiring such receipt in exchange for such premium.

"(F.) The court instructs the jury, that in considering this case you must not go beyond the evidence to hunt up doubts, nor must you entertain such doubts as are merely chimerical or conjectural.

"A doubt as to the fact of suicide must be a reasonable doubt and it must arise from a candid and impartial investigation of all the evidence in the case. If after considering all the evidence you can say that you have an abiding conviction of the truth of the charge of suicide, you are satisfied beyond a reasonable doubt, and must find for the defendant."

The assured died about 9 P. M. on March 23, 1906. On the morning of that day he wrote a letter to his wife which she received from the postman in the city of Roanoke, at about 4 P. M. on the same day. This letter, which was admitted in evidence over the objection of the defendant, is as follows:

"Since coming down town I find I have to raise a little more money than I have got on hand, so as George Wright wants to buy me out at Leah's I will just go over there to-day and get

the money and come back to-day. So don't get uneasy. I will certainly get back to-night; or at twelve o'clock to-morrow.

"I feel ashamed of myself for not having the money for Moir and Trout, as my word is out on Saturday, 24th. I must try and get it for them, while I do not feel like going over there. I feel very bad. I could not sleep any last night. Maybe I will feel better after the morning. I am at Starkey's and feel so sick I can hardly sit up in my seat; oh I do feel so weak and bad.

"D. P. WILLIS."

*Scott & Buchanan* and *Dillard & Lee,* for the plaintiff in error.

*N. H. Hairston* and *Hunt & Staples,* for the defendants in error.

Keith, P., delivered the opinion of the court.

S. W. Hairston, as the next friend of certain infants, recovered a judgment against the Life Insurance Company of Virginia in the Circuit Court of the city of Roanoke; and upon the petition of the defendant company the record is now before us to review certain rulings of the trial court.

On the 6th of February, 1906, the company issued a policy of insurance upon the life of David Peter Willis, the father of the infant plaintiffs, in consideration of the application for said policy, which is made a part thereof, and upon condition that the quarterly annual premium of $20.41 should be paid in advance on the delivery of said policy, which the declaration alleges was duly paid. It is also averred that Willis died on the 23rd of March, 1906, while the policy was in force; that due proof of his death had been furnished the defendant; that all the conditions of the policy had been complied with; and that, nevertheless, the defendant refused to pay it.

The application which was signed by Willis, the applicant, and countersigned by the agent of the company, contains, among others, the following provisions:

1. "That I warrant the statements and representations made above, as well as those made or to be made to the company's medical examiner, to be full, complete and true, whether written by my hand or not, and that they, together with this agreement, shall form the basis and become a part of any contract of insurance that may be issued under this application."

2. "That the liability of the company under said policy will be limited to the amount of reserve under said policy according to the American expericence table of mortality, and 3 *per cent.* interest, if during the next two years following the date of issue of the policy of insurance for which application is hereby made  *  *  *  I die by my own hand or act, whether sane or insane, or if my death be caused by the use of narcotics or alcoholic stimulants within two years from the date of said policy.  *  *  *  "

4. "That the company shall incur no liability under this application until it shall have been received and approved at the home office of said company, the policy issued and the first premium paid and accepted by the company or by its authorized agent during my lifetime and my good health.  *  *  *  "

6. "That if any premium be not duly paid, all rights, claims or interest in the policy hereby applied for, or in any of its provisions, guarantees or benefits other than those stipulated in the said policy, whether required or provided for by the statute of any State or not, are hereby specifically waived and relinquished.

7. "That I shall have the right to change the beneficiary or beneficiaries in the policy applied for, whenever or as often as I may desire, except when the beneficiary is a married woman or a married woman and her children or her husband's children, and, further, that I as the insured may without the consent of the beneficiary or beneficiaries receive any benefit, exercise

every right and enjoy every privilege conferred upon the insured by the policy applied for if one be issued."

In the medical examination referred to in this application, it was asked:

"Have you ever used malt or spiritous liquors to excess?" A. "Fifteen years ago used whisky slightly to excess."

Q. "State the quantity you use each day of—malt liquors—wines—spirits?" A. "Average about two drinks of whisky or beer a week. Do not drink either daily."

Q. "Have you ever used opium?" A. "No."

Q. "Chloral?" A. "No."

Q. "Or any narcotic?" A. "No."

The policy sued on appears on its face to have been issued subject to certain conditions, among others, that it "shall not take effect until the first premium is paid, nor unless on the date of said payment the insured is living and in sound health, and when this contract is completed by its delivery and by the payment of the first premium, it shall be construed as having been in force from the date of its execution, as stated on the first page thereof. Each premium is due and payable at the home office of the company in the city of Richmond, but at the pleasure of the company will be accepted elsewhere when duly paid in exchange for the company's receipt, signed by the president or secretary and countersigned by the local agent designated therein;" that "thirty days' grace, during which time the policy will remain in force, will be allowed in the payment of any premium except first;" that "agents are authorized to receive and forward applications for insurance, but only the president, the vice-president or secretary has power on behalf of the company to make or modify this or any other contract of insurance, or to extend the time for paying any premium, and the company shall not be bound by any promise or representation heretofore or hereafter made, unless made in writing by one of the said officers."

The defendant filed certain special pleas, presenting the defenses arising upon these warranties and stipulations in the policy.

One plea avers that the applicant "did within two years from the date of the policy, to-wit, on March 23, 1906, die by his own hand, by administering to himself strychnine poison which caused his death; that the amount of the reserve under said policy, according to the tables aforesaid on the date of his death, was $14.21, which amount with interest had been duly tendered the plaintiffs, and being refused was brought into court."

The defendant also pleaded, that the insured had warranted the answers given on the medical examination to be full, complete and true; and that the warranty had been broken, in this, that the answers above mentioned were not full, complete and true, but were false.

Upon these pleas issue was joined.

The first assignment of error in the petition is as to the admission of evidence set out in bills of exceptions Nos. 1, 2 and 3.

The plaintiff put the witness, Ayers, upon the stand to prove the due payment in advance of the first quarterly premium, amounting to $20.41. After testifying that he was, in January and February, 1906, the special agent of the defendant company; that he received from D. P. Willis the application and delivered the policy attached to the declaration during his lifetime, the witness was asked by the attorney for the plaintiffs if the premium mentioned in the policy was paid to him as agent for the company before the policy was delivered on February 6, 1906. To this question the witness answered as follows: "The amount of $5.41 was paid to me when this policy was delivered and note given for $15, for the balance of the premium, made personally to me." On the 10th of March, following, he endorsed this note and put it in bank for collection, and never accounted to the company or delivered the pre-

mium receipt until the note was paid, March 16, six days after its maturity. He stated that the note was given to him for the payment of the premium. Thereupon counsel for plaintiffs asked the witness the following question: "What is the rule of your company, according to your instructions and according to the practice of your company, with reference to the delivery of a policy?" A. "When a policy is delivered—when it is issued and delivered by the company—it is binding on the company." Objection was made to this question and answer by the plaintiff in error, but the court overruled the objection and allowed the evidence to go to the jury.

Defendant in error, in answer to this assignment, asserts that the answer of the witness was no more than a statement of a rule of law which is unquestionably correct—that is to say, that the policy is binding when it is issued and delivered by the company; all of which is true. But it is something more than a statement of a rule of law. It is a statement of a rule of law which is predicated upon the proof of certain antecedent facts. It is the application of the law to the facts, and calls upon the witness to express an opinion upon the point in issue between the plaintiffs and defendant.

In May on Insurance (4th ed.), sec. 43-a, it is said to be incompetent for a witness to say that in his opinion insurance is effected and completed by the acceptance of the order.

And in *Lindauer* v. *Delaware, &c. Ins. Co.,* 13 Ark. 470, the opinion was expressed by a witness in his deposition, "that the insurance is effected and completed by the acceptance of the order for insurance, and the company would have been bound to pay in this case if loss had accrued." The court was of opinion, that "the admission of such a statement as evidence, against the objection of the defendant, was a violation of the rules of evidence. Inasmuch as the merits of the case turned on the question whether, upon the facts stated, the company had incurred any risks, so as to have earned the premium, the witness might as well have testified that the plaintiff is entitled to recover in this case."

We shall again refer to this question when we come to consider the instructions given by the court to the jury.

Bill of exception No. 2 taken to a ruling of the court refusing to permit plaintiff in error to propound certain questions to a witness; but it appears that the questions were afterwards asked the witness and answered without objection, so that plaintiff in error was not aggrieved by this ruling of the court.

The next exception was taken to the refusal of the court to permit a physician to testify as to certain statements made to him by the insured on the 14th day of March, 1906. The physician testified that on that day he found Willis, the insured, under the influence of opium; that from his personal examination and from information at the time received from the insured, he was confident that he was under the influence of opium; that in answer to his question Willis told him, "that he could take two or three bottles of laudanum a day, and had been taking that much for two or three years." When asked how he got in the habit of taking the drug, he replied that it was from the fact of its having been prescribed by a physician. The court refused to permit this evidence to go before the jury, upon the ground that this conversation occurred on the 14th day of March, while the policy in suit had been delivered to the insured on the 28th day of February, who had previously paid a portion of the first premium and had given his note for the balance thereof payable to the agent who had delivered the policy, and of this partial payment the company had notice prior to the 14th day of March, the date of the conversation of the physician with the insured; that the general agent of the company knew that the special agent who wrote and delivered the policy had taken a note payable to himself on the 10th of March for the balance of the first premium; and that the special agent was responsible to him for the amount of the note.

We think it fully appears that the general agent was informed as to every detail of the transaction—the partial payment, the taking of the note, that the note was not paid at

maturity on the 10th of March, and that it was subsequently paid on the 16th day of that month.

Vance on Insurance, at p. 206, says: "The insurer may always accept in payment of the premium the liability of a third party, and, therefore, if the insurer debits the premium to the agent, and looks to him ultimately for payment, then as between the insured and the insurer, the premium is paid." And on page 178 it is said: "Even though the parties may have expressly agreed that the contract shall not be deemed complete until payment of the (first) premium in cash and in full, this stipulation may be waived by the insurer or any of his agents having competent authority. As a general rule, any agent having power to execute and issue contracts on behalf of the insurer has power to waive a condition of prepayment. And an absolute delivery of the policy by such an agent without payment of the premium, under such circumstances as will justify inference that credit is to be given, will constitute a waiver of a condition of prepayment."

In this case, the special agent, Ayers, had given the bond of a guaranty company to make good all that might be due by him to the insurance company; and it appears from the evidence of the general agent that it was a practice known to and approved by the company for agents to take such notes, payable to themselves, and charge themselves therewith in their agency account, the company holding the agent responsible as for a cash collection.

In *Kilborn* v. *Prudential Ins. Co.,* 99 Minn. 176, 108 N. W. 61, and in *Kimbro* v. *N. Y. L. Ins. Co.,* 134 Iowa 84, 108 N. W. 1025, 12 L. R. A. (N. S.) 421, it is held that such a transaction is a payment of the premium as between the insured and the company.

We think this is shown by the following questions and answers of the general agent:

"Q. When he (Ayres) accepted the note, he was responsible to you for the amount of the note? A. Yes, sir.

"Q. Then when he became responsible to the company, or to you, for the amount of that note, it was because the company had given some value for the amount of that note, and had a right to the money, was not it? A. Yes, sir.

"Q. What other value could you have given except the delivery of the policy? A. No other."

It also appears that it was a practice of the company to permit its agents to give credit for premiums, and to be themselves responsible for the payment thereof.

These admissions were brought out during the cross-examination of the general agent, and he did, without doubt, make statements in apparent conflict with the quotations which we have made from his evidence; but we think that it may fairly be deduced from all that this witness said, that the company was advised of what had occurred in this case between the special agent and the applicant for insurance; that while they did not trust to the personal liability of Ayres, they did rely upon the bond which he had given as surety for the faithful performance of his duties; and it further appears that what occurred in this case was in accordance with the practice of the company in other cases.

The policy, then, being in force on the 14th day of March the question as to the admissibility of the statements made by the insured to his physician turns upon whether or not they were statements made against the interest of the insured.

In 16 Cyc., page 1218, it is said that such testimony is not highly favored by the courts, and the tendency is rather to restrict than to enlarge the right to receive it, or at least require the evidence to be brought clearly within the conditions requisite for its reception. They are not admissible unless they were made to the knowledge of the declarant against his obvious and real interest (*Turner* v. *Dewan*, 41 N. O. Q. B. 361), and that interest must have been of a pecuniary or proprietary nature (*Burton* v. *Scott*, 3 Rand. 399; *Tate* v. *Tate*, 75 Va. 522).

Looking to the provisions of the policy in this case, the interests of the insured were so remote and contingent as scarcely to be deemed of a pecuniary or proprietary nature, and were not so direct and obvious as presumably to have been present in his mind at the time of the declaration.

We think there was no error in this ruling of the court.

Bill of exception No. 4 is to the refusal of the court to permit plaintiff in error to show by a witness the condition of the deceased on March 14, 1906, and his habits at that time as to the use of intoxicants.

We are of opinion that this evidence was properly excluded. The contract was at that time complete, and the condition of the insured was no longer material. If the theory of plaintiff in error, that the policy did not become effective until March 16, when the note for a part of the initial premium was actually paid, were correct, its contention would not be without force, and it might be proper to inquire as to the condition of his health on March 14, under that clause of the policy which provides that it shall not take effect unless at the date of payment of the first premium the insured is in sound health; but being of opinion that, under all the circumstances of this case, the policy became effective when it was delivered by the special agent, evidence as to the condition of the insured on the 14th of March is immaterial and inadmissible.

The fifth bill of exception is to the action of the court in permitting the wife of the deceased to read in evidence the letter received by her from him on the date of his death.

This letter was written by Willis on the morning of the 23rd of March, 1906, and received by his wife about four o'clock in the afternoon of that day. It is postmarked as mailed at Roanoke at 1.00 o'clock P. M., and was certainly written before that hour. We do not think it of much importance to the case, but are of opinion that it constitutes no part of the *res gestae* and should have been excluded.

We come now to the instructions given and refused at the trial.

Instruction No. 1 given on behalf of the plaintiff is erroneous, in this, that it is predicated upon only a portion of the facts shown in evidence, bearing upon the question of suicide. It is proper for the court to tell the jury what is the law as applied to a hypothetical statement of facts, but that statement must present the case shown in evidence fairly to the jury. The instruction under consideration tells the jury, that if the deceased on the evening of his death was found in convulsions which continued until he died, and that strychnine was discovered in his stomach, this alone is not sufficient to prove suicide. Another instruction then might have been given presenting another part of the evidence, in which the jury might with propriety be told that it was insufficient to warrant a conviction; while, if all the facts had been grouped in one instruction, a wholly different conclusion should have been reached.

The tendency of such a method of presenting the facts of a case to the jury is to distract and mislead them, and the court should content itself with giving the jury general principles of law and leaving them to apply those principles to the facts in evidence before them, or else it should be careful, if it prefers to present a hypothetical case to the jury, to put before the jurors all the facts bearing upon the issue which the evidence proves or tends to prove.

The second instruction propounds to the jury a general principle and propounds it correctly, except that it would have been better to have said, that the evidence to warrant a verdict for the defendant on the ground that the accused came to his death by suicide should exclude every *reasonable* hypothesis of accidental death. See *Cosmopolitan L. Ins. Co.* v. *Koegel,* 104 Va. 619, 52 S. E. 166.

The third instruction is in the language of the statute, and was properly given.

The fourth instruction should not have been given in the form in which it was presented. Under that instruction, it might be that the defendant company placed the policy in the

hands of its agent Ayres, who delivered it to the insured, and by such delivery he may have violated express instructions limiting his authority, which limitations were known to the applicant, and the company have been ignorant of the fact of delivery in violation of its instructions, and yet it would be liable, unless it gave the applicant notice that it wished to cancel the policy, upon the ground that it would thereby have waived the condition of prepayment of the premium.

Our view is, as we have already stated, that the policy was in effect in this case, because the company, through its general agent, knew of all that had taken place between the special agent and the insured, and because, under the circumstances of the case and in accordance with the practice of the company, there had been, as between the applicant and the company a payment of the premium before the policy was delivered.

The fifth instruction was properly given. See *Va. Fire & Marine Ins. Co.* v. *Hogue,* 105 Va. 355, 54 S. E. 8.

The first instruction given by the court was doubtless in lieu of the first instruction asked for by plaintiff in error. We do not think that either of them is strictly accurate. We are of opinion that the defense of suicide should be established by clear and satisfactory proof, such as is required to establish a fraud.

As was said by this court in *Va. Fire & Marine Ins. Co.* v. *Hogue, supra,* the burden of proof to establish such a defense is upon the defendant, and he must make it out by clear and satisfactory proof—not proof beyond a reasonable doubt, nor a preponderance in the ordinary sense, but such a preponderance as is necessary to overcome the presumption of innocense of moral turpitude or crime.

But, on the other hand, it does not require that degree of proof which is necessary to convict in a criminal prosecution, where it is proper to instruct the jury that they should acquit, unless the evidence is sufficient to establish guilt beyond a reasonable doubt. As applied to the proof of fraud or of suicide,

the preponderance of the evidence should be such as to over-
come the presumption of innocence of moral turpitude or crime;
and, if upon a consideration of all the evidence relating to any
fact, the jury should be of opinion that the greater probability
from all the evidence is in favor of the existence of that particu-
lar fact, then they must so find, and the result of the facts thus
ascertained must be such as to overcome the presumption of
innocence of moral turpitude or crime.

The second instruction given by the court was in lieu of the
second instruction asked for by plaintiff in error. It follows
from what we have said that in our opinion the instruction
asked for should have been given.

Instruction No. 3 given by the court is in the place of No. 3
asked for by plaintiff in error. They are substantially the same
—at least, we discover no such difference between them as
would render the substitution by the court of its own instruc-
tion and the refusal by it of that asked for by plaintiff in error
ground for reversal.

The fourth instruction given by the court we think is open
to the objection already considered with reference to other
instructions. As was said with reference to the second instruc-
tion given at the request of defendants in error, it would have
been proper for the court to have told the jury that the evidence
should exclude every *reasonable* hypothesis.

We think instruction No. 5 given by the court was correct,
upon the authority of *Va. Fire & Marine* v. *Hogue* above cited.

Plaintiff in error asked for a second set of instructions, the
first of which, taking up instruction No. 1 given by the court
on motion of the plaintiff, undertakes to state the case made
by the record upon the issue of whether or not the insured came
to his death by his own act. It embraces much that was omit-
ted from the instruction given by the court, but we think that
the court rightly concluded that it was wiser to leave the jury
to apply the evidence, with such aid as the court could afford by
propounding general principles of law.

All of the second set of instructions asked for by plaintiff in error were given, except the first and those marked, respectively, "D" and "E."

In instruction "D" the court was asked to tell the jury, that if it was shown by a preponderance of all the evidence that the deceased was addicted to the use of opium prior to the date he was examined by the medical examiner, they must find for the defendant. This was properly refused, because there was no sufficient evidence before the jury to warrant an instruction upon that point.

Instruction "E" goes back to the original proposition, that each premium, unless paid at the home office, can only be paid in exchange for the defendant company's receipt, signed by the president or secretary, and countersigned by the local agent designated therein; and that the policy did not take effect until the first premium was paid, and not then if the insured was not in sound health on the date of such payment; and that, therefore, if the jury should believe from the evidence that the first premium was not paid in exchange for the receipt of the company signed by the president or secretary of the company, etc., until the 16th day of March, 1906, and if they further believe from the evidence that the insured was not in sound health on said date, then they must find for the defendant, unless the company had, by its president, vice-president or secretary, changed said contract in respect to requiring such receipt in exchange for such premium."

This leaves out all the evidence with respect to the general agent and the general course of business on the part of the company, and was properly refused.

As the case must go back for the reasons given, we shall refrain from any expression of opinion as to the evidence.

The judgment of the circuit court must be reversed, the verdict of the jury set aside, and the case remanded for a trial to be had in accordance with the views herein expressed.

*Reversed.*